IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Case No. 09-00634-TOM-11 |
| BFW LIQUIDATION, LLC f/k/a | ) Chapter 11 |
| BRUNO'S SUPERMARKETS, LLC, | ) |
| | ) |
| Debtor. | ) |
| _____ | ) |
| | ) |
| WILLIAM S. KAYE, as Liquidating | ) |
| Trustee of BFW Liquidation, LLC, | ) |
| | ) |
| Plaintiff, | ) Adv. Proc. No. 11-00063 |
| | ) |
| v. | ) |
| | ) |
| BLUE BELL CREAMERIES, INC., | ) |
| | ) |
| Defendant. | ) |

_____

**MEMORANDUM OPINION AND ORDER**

This adversary proceeding came before the Court on March 14, 2016, for trial[1] on the Amended Complaint filed by Plaintiff William S. Kaye, as Liquidating Trustee (the "Plaintiff" or the "Trustee") for Bruno's Supermarkets, LLC n/k/a BFW Liquidation, LLC (the "Debtor" or "Bruno's") against Defendant Blue Bell Creameries, Inc. (the "Defendant" or "Blue Bell"). Appearing before the Court were John D. Elrod and David B. Kurzweil, attorneys for the Trustee; Bill D. Bensinger, attorney for Blue Bell; William S. Kaye, Trustee; and David Rogas, Joel Rogers, and Michael Atkinson, witnesses. This Court has jurisdiction pursuant to 28 U.S.C. §§

---

[1] Based on no written objections having been filed and no verbal objections having been voiced at any hearings in this adversary proceeding, all parties and their counsel have implied their consent and thus will be deemed to have consented to entry by the Bankruptcy Court of any and all final orders and judgments in this adversary proceeding.

1334(b), 151, and 157(a) and the District Court's General Order of Reference Dated July 16, 1984, As Amended July 17, 1984.[2] This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(F).[3] This Court has considered the pleadings, arguments of counsel, the testimony of witnesses, the exhibits, and the law, and finds and concludes as follows:[4]

## FINDINGS OF FACTS[5]

The Debtor filed its bankruptcy case under Chapter 11 of the Bankruptcy Code on February 5, 2009 (the "Petition Date"). The Debtor was a Birmingham, Alabama-based grocery store chain with stores in Alabama and the Florida panhandle. Bruno's operated stores under the Bruno's Supermarkets, FoodMax, and Food World banners.

The Trustee was appointed pursuant to the Debtor's Fourth Amended Chapter 11 Plan of Liquidation, which became effective on October 5, 2009. Thereafter, on January 27, 2011,[6] the Plaintiff filed this adversary proceeding seeking the avoidance and recovery of $563,869.37 in transfers pursuant to 11 U.S.C. §§ 547 and 550. Further, pursuant to 11 U.S.C. § 502(d), the

---

[2] The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:
> The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

[3] 28 U.S.C. §157(b)(2)(F) provides as follows:
> (b)(2) Core proceedings include, but are not limited to–
> …
> (F) proceedings to determine, avoid, or recover preferences [.]

[4] This Memorandum Opinion constitutes findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to contested matters in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Bankruptcy Procedure 9014.

[5] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. Unit B July 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975).

[6] The Debtor's underlying bankruptcy case and all related adversary proceedings were originally assigned to the Hon. Benjamin G. Cohen and re-assigned to this Court in December 2014 due to Judge Cohen's retirement.

2

Plaintiff sought the disallowance of the Defendant's general unsecured claim of $125,372.90 (the "Claim").

The Plaintiff and the Defendant have stipulated that the prima facie elements of the preference claim contained in § 547(b) have been met with respect to the transfers at issue in this litigation, which are set forth in the following chart (collectively, the "Transfers"):

| Payment Number | Bank Clear Date | Amount |
|---|---|---|
| 324523 | 11/12/2008 | $43,924.47 |
| 325041 | 11/25/2008 | $67,821.23 |
| 325528 | 12/2/2008 | $55,149.91 |
| 326033 | 12/5/2008 | $27,485.38 |
| 326504 | 12/9/2008 | $33,320.61 |
| 326987 | 12/15/2008 | $26,327.00 |
| 327482 | 1/5/2009 | $59,980.15 |
| 327984 | 1/6/2009 | $55,508.85 |
| 328421 | 1/13/2009 | $47,162.09 |
| 328928 | 1/20/2009 | $28,483.07 |
| 329845 | 1/30/2009 | $48,213.42 |
| 329374 | 1/30/2009 | $33,186.46 |
| 330264 | 2/3/2009 | $37,306.73 |
| | **Total:** | **$563,869.37** |

At trial, Blue Bell asserted two defenses under section 547(c) of the Bankruptcy Code. First, Blue Bell asserts that it has a "subjective" ordinary course of business defense under section 547(c)(2) of the Bankruptcy Code. The Trustee disputes this defense in its entirety.

Second, Blue Bell asserts that it has a subsequent new value defense under section 547(c)(4) of the Bankruptcy Code. While the Trustee acknowledges that the subsequent new value defense applies, he disputes the extent to which this defense applies.

    **I.      Prepetition Relationship between Bruno's and Blue Bell.**

Blue Bell manufactured and sold ice cream and related products to Bruno's on credit.

3

According to the testimony of Blue Bell branch manager David Rogas, Blue Bell's salesmen brought products directly to the Debtor's stores, merchandized those products, removed any out-of-date product, and restocked Bruno's ice cream coolers within the grocery stores. Mr. Rogas testified that the payment terms between Bruno's and Blue Bell were weekly – or 7 day – terms. He further testified that historically, Blue Bell received checks from their customers, including Bruno's, at a lockbox at JPMorganChase and from there the checks would be deposited into Blue Bell's account. Blue Bell introduced into evidence copies of several checks from Bruno's with check dates from December 6, 2007 through January 23, 2009. To the right of each copy of a check is a box containing certain information labeled "business date," "reference no.," "seq w/i refno," and "check amount." Mr. Rogas testified that neither Blue Bell nor Bruno's could control the "business date" reflected in each box, and admitted that no one present at trial could testify when a particular check was received by the bank, the date of deposit, or what the notation "business date" referred to.

## II. Bruno's liquidity problems

Joel Rogers, Senior Director at the advisory firm Alvarez and Marsal ("A&M"), testified that Bruno's engaged A&M in August 2008 to provide financial advisory and turnaround management services. According to Mr. Rogers, one reason for A&M's engagement by Bruno's was to assist with cash flow management, as Bruno's was experiencing liquidity issues and was expected to run out of cash. Mr. Rogers testified that beginning in August 2008 A&M began assisting Bruno's with this facet of its finances; to do this, A&M and Rogers developed cash forecasting models which were intended to project Bruno's cash needs over future periods of time. Mr. Rogers explained that prior to A&M's engagement, Bruno's had generally paid certain of its vendors, including Blue Bell, twice weekly. To conserve cash, and upon A&M's recommendation

4

Case 11-00063-TOM Doc 120 Filed 12/20/16 Entered 12/20/16 11:50:34 Desc Main
Document Page 4 of 18

in August 2008, Bruno's began paying its vendors, including Blue Bell, once a week. According to Mr. Rogers, Bruno's began "stretching," or delaying, payments during the ninety days prior to the Petition Date (the "Preference Period"), a practice that sometimes included actually cutting checks but then holding them for a period of time. Mr. Rogers opined that Bruno's had not previously stretched payments because the employees seemed unfamiliar with the concept when he explained it.

Bruno's introduced into evidence the expert witness report (the "Expert Report") of Michael L. Atkinson, who, according to his testimony, is a CPA specializing in financial restructuring and who has been qualified as an expert witness about four times.[7] According to Mr. Atkinson's testimony and his Expert Report, over 50% of invoices from Blue Bell to Bruno's were paid (the date of payment being the date the check cleared the bank) within 39 days of the invoice date during the pre-Preference Period,[8] and 92% had been paid within 44 days of the invoice date. During the Preference Period, the time by which over 50% of the invoices were paid had increased to 47 days, and only 29% had been paid at 44 days or sooner. *See* Exh. D to Plaintiff's Exh. 42. In addition, Mr. Atkinson's testimony and the Expert Report reflect that there was an average of 7 days between the date of a check and the date the check cleared the bank in the pre-Preference period (excluding the Restructuring Period), which increased to an average of 16 days between the check date and the check clear date during the Preference period. *See* Plaintiff's Exh. 42, section IV.

### III. Blue Bell's collection efforts

---

[7] Mr. Atkinson's credentials are set forth in detail in his Expert Report. *See* Plaintiff's Exh. 42.
[8] According to Mr. Atkinson's testimony and the data contained in his Expert Report, it appears that Mr. Atkinson's ordinary course analysis took into account three periods of time – the "Preference Period" which was the 90 days prior to the bankruptcy filing date of February 5, 2009; the "pre-Preference Period," which appears to be from one year prior to the bankruptcy filing date to the start of the Preference Period, and the "Restructuring Period," from July 1, 2008 to November 6, 2008, just prior to the beginning of the Preference Period, which essentially coincides with the time A&M became involved with Bruno's.

5

Bruno's presented evidence that shortly before the beginning of the Preference Period Blue Bell began to increase its efforts to collect money owed by Bruno's. The Trustee testified that he has possession of Bruno's computer and email servers, which date from approximately 2003 through the post-petition period. He further testified that, upon his review of Bruno's emails, he found no emails between Bruno's and Blue Bell dealing with collection matters that were dated prior to October, 2008. Blue Bell introduced no evidence to contradict the Trustee's testimony.

The first email introduced into evidence regarding a collection attempt by Blue Bell was dated October 27, 2008. Defendant's Exh. 1. Mr. Rogas testified that initially the emails concerned "skipped" or "mispaid" invoices totaling $14,853.49 but by January 12, 2009, the emails addressed missed weekly payments.[9] On January 26, 2009, Mr. Rogas emailed Tim Cano, Bruno's Director of Private Label and Non-Perishable Operations, and Kris Smith, Bruno's Operational Accounting Manager, about payment, indicating that he was getting pressure to have an answer on a payment issue that day. *See* Defendant's Exh. 9. A January 28, 2009 email sent by Mr. Rogas to certain Blue Bell employees directed that service to Bruno's should be immediately stopped. *See* Defendant's Exh. 11. Also on that date Mr. Rogas went in person to Bruno's headquarters and picked up checks of $33,186.46 and $48,213.42, a collection technique that Mr. Rogas testified he had not previously employed. *See* Defendant's Exh. 12. On January 29, 2009, Mr. Rogas instructed via email that service could resume at all Bruno's locations, although the service should be limited to "fronting product," meaning, as he explained at trial, organizing the products in the freezer but not replenishing products. *See* Defendant's Exh. 13. Also on January 29, Mr. Rogas sent an email to Mr. Cano and Mr. Smith regarding whether Blue Bell should plan

---

[9] Mr. Rogas testified that "mispaid" invoices are those where there is a discrepancy between what the customer paid and what Blue Bell had expected to be paid, which could be, for example, due to a customer having run a promotion past the cut-off date.

6

to pick up additional checks on February 2 and February 9, 2009, or whether the checks would be sent by mail or FedEx. *See* Defendant's Exh. 14. A February 2, 2009 email from Mr. Rogas indicates that he ultimately picked up a $37,000 check from Bruno's on that date. *See* Defendant's Exh. 16. On February 3, 2009, Mr. Rogas emailed instructions that while Blue Bell salesmen should continue to front product at Bruno's locations they should not deliver additional products. *See* Defendant's Exh. 17.

### IV. "New value" provided during the Preference Period

The parties have stipulated that Brunos paid to Blue Bell a total of $563,869.37 during the Preference Period. Mr. Atkinson testified that his expert report included a new value analysis using information from Bruno's books and records. He concluded that if only "unpaid" new value could be used, as Bruno's advocates, that Blue Bell has a net preference liability of $438,496.47. However, if both "paid" and "unpaid" new value could be used, in accordance with Blue Bell's argument, Blue Bell has a net preference liability of $218,144.50. *See* Exh. C to Plaintiff's Exh. 42. Mr. Atkinson further testified that after counsel for Blue Bell had identified some discrepancies between the books and records of Blue Bell and those of Bruno's, he re-analyzed the preference liability using Blue Bell's numbers, resulting in a net preference liability of $437,758.46 using only "unpaid" new value, and $218,773.66 using both "paid" and "unpaid" new value. *See* Exh. C-1 to Plaintiff's Exh. 42. Mr. Atkinson indicated that in making his calculations he used the invoice date and the date the check cleared the bank to determine whether new value was provided subsequent to the payment in question.

Blue Bell introduced into evidence a chart prepared by Mr. Rogas which he referred to as a "new value spreadsheet." *See* Defendant's Exh. 20. He testified that his calculations as to the amount Blue Bell owed after application of new value were made using the invoice date, which is

the date the driver made a delivery, and the "check deposit date"[10] that he obtained from a copy of each check. According to Mr. Rogas's chart, Blue Bell's preference liability is $207,125.80.

## CONCLUSIONS OF LAW

### I. *Prima facie* case

Because the parties have stipulated that the Plaintiff has satisfied his burden of proof with respect to each of the elements of section 547(b) of the Bankruptcy Code, the *prima facie* case has been satisfied and the burden of proof shifts to the Defendant regarding its asserted ordinary course of business and subsequent new value defenses.

### II. Blue Bell's asserted defenses

#### a. Burden of proof for defenses under section 547(c)

Pursuant to section 547(g) of the Bankruptcy Code, Blue Bell has the burden of proof regarding its asserted defenses. *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1565 n.4 (11th Cir. 1986). The creditor asserting a defense must prove each element of its defense by a preponderance of the evidence. *Jones v. United Sav. and Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Arkansas Inc.*,) 9 F.3d 680, 682 (8th Cir. 1993).

#### b. Ordinary Course of Business Defense

Section 547(c)(2) provides an affirmative defense to creditors that receive payments which would otherwise be voidable preferences if those payments were made in the ordinary course of business. *Miller v. Florida Mining and Materials (In re A.W. & Assoc., Inc.)*, 136 F.3d 1439, 1441 (11th Cir. 1998). To establish an ordinary course of business defense, a creditor must show that the debt was incurred in the ordinary course of business or financial affairs between the parties, and

---

[10] Mr. Rogas testified that he used the "business date" as reflected in a box on the side of the copy of each check in question as the "check deposit date" in his chart. As previously explained, he admitted that he does not know for certain what the notation "business date" actually represents.

8

then establish that transfer of property to the supplier was ordinary in the course of business or financial affairs between the parties or was made according to ordinary business terms.[11] *Carrier Corp. v. Buckley (In re Globe Mfg. Corp.)*, 567 F.3d 1291, 1297 n.4. The ordinary course of business between the parties is shown by demonstrating that the transfer was consistent with a pattern of previous transfers between the parties. *Id*. at 1298. The transferee must demonstrate that the transfer was made in a manner falling within these practices.

In contrast to section 547(b), the "purpose of the ordinary course of business exception is to protect the normal, ordinary relationship between debtors and creditors engaged in recurring credit transactions. This exception was created to encourage creditors to continue to deal with troubled debtors without fear of having to disgorge payments, thus stalling bankruptcy and enabling the debtor to continue in business as a going concern, if appropriate." *Moltech Power Sys., Inc. v. Tooh Dineh Indus., Inc. (In re Moltech Power Sys., Inc.)*, 327 B.R. 675, 679 (Bankr. N.D. Fla. 2005) (Killian, J.), citing *Barrett Dodge Chrysler Plymouth, Inc. v. Crenshaw (In re Issac Leaseco, Inc.)*, 389 F.3d 1205 (11th Cir. 2004); *Fiber Lite Corp. v. Molded Acoustical Prod. Inc. (In re Molded Acoustical Prod., Inc.)*, 18 F.3d 217 (3rd Cir. 1994); *Gonzales v. DPI Food Prod. Co. (In re Furrs Supermarkets, Inc.)*, 296 B.R. 33, 39 (Bankr. D.N.M. 2003).

As one court has explained:

> The . . . ordinary course of business test evaluates the relationship that existed between the parties themselves and is a fact-intensive inquiry by nature. *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir.1991); *See In re A.W. & Associates, Inc.*, 136 F.3d 1439, 1441–42 (11th Cir.1998); *In re Furrs Supermarkets, Inc.*, 296 B.R. 33 (Bankr.D.N.M.2003). In essence, whether a given transaction was within the subjective ordinary course of business that had developed between the parties is a broad, fact-based inquiry requiring historic examination of the parties' pre-preference period relations. These past relations are then compared

---

[11] Blue Bell presented no evidence, and did not argue, that the Transfers were made according to ordinary business terms and were therefore shielded by 11 U.S.C. § 547(c)(2)(B). Accordingly, the Court will only consider whether the Transfers were made in the ordinary course of business or financial affairs between the parties, as set forth in 11 U.S.C. § 547(c)(2)(A).

9

to the subsequent business practices that occurred during the preference period to determine whether they were consistent with each other. In short, the question is whether the parties altered their credit arrangement. See *In re Issac Leaseco*, 389 F.3d 1205, 1210 (11th Cir.2004).

*Moltech Power Sys.*, 327 B.R. at 680.

In *Menotte v. Oxyde Chemicals., Inc. (In re JSL Chemical Corp.)*, 424 B.R. 573 (Bankr. S.D. Fla. 2010) (Hyman, J.), the court noted that:

> In determining whether transfers are protected from avoidance based upon the ordinary course of business, courts consider: 1) the prior course of dealings between the parties; 2) the amount of the payments; 3) the timing of the payments; and 4) the circumstances surrounding the payments. *Jensen v. Raymond Bldg. Supply Corp. (In re Homes of Port Charlotte Florida, Inc.)*, 109 B.R. 489, 491 (Bankr.M.D.Fla.1990). Under this test, the parties' transactions during the pre-preference period are examined to determine the parties' ordinary course of business. Transactions occurring during the preference period are then compared to the parties' pre-preference transactions to see if they were made in a similar manner. *Moltech Power*, 327 B.R. at 680. *See also In re Felt Mfg. Co.*, 2009 WL 3348300, at *6 (Bankr.D.N.H. Oct.16, 2009) ("the overall controlling consideration is whether the transactions between the debtor and the creditor both before and during the 90–day preference period were consistent").

*JSL Chem. Corp.*, 424 B.R. at 579.

In *Craig Oil*, the Eleventh Circuit affirmed the bankruptcy court's determination that payments which were late or made in response to unusual collection activity were not sheltered by the ordinary course of business defense. *Craig Oil*, 785 F.2d at 1566-68. *See also Anderson-Smith & Assoc., Inc. v. Xyplex, Inc. (In re Anderson-Smith & Assoc., Inc*.), 188 B.R. 679, 686-87 (Bankr. N.D. Ala. 1995); *Florida Steel Corp. v. Stober (In re Indus. Supply Corp.),* 127 B.R. 62, 64-65 (M.D. Fla. 1991), aff'd without opinion, 961 F.2d 1582 (11th Cir. 1992) (district court affirmed a bankruptcy court's finding that payments resulted from "extraordinary collection efforts" despite similar payment intervals during and prior to the preference period); *Schwinn Plan Comm. v. AFS Cycle & Co., LTD (In re Schwinn Bicycle Co*.), 205 B.R. 557, 565-66, 572-73 (Bankr. N.D. Ill. 1997) (weekly or biweekly calls during the preference period from a creditor regarding delinquent

payments were not within the parties' ordinary course of business when the creditor "rarely" made such calls prior to that time).

According to the court in *Schwinn Plan Committee v. AFS Cycle & Co., LTD (In re Schwinn Bicycle Co.)*:

In order to demonstrate the applicability of § 547(c)(2)(B), the creditor must prove:

> the absence of any unusual collection efforts or protectionist demands directed at the debtor, and the absence of any other significant or material change in the way it treated the debtor during the preference period....

*Marlow v. Fed. Compress & Warehouse Co. (In re Julien Co.)*, 157 B.R. 834, 838 (Bankr.W.D.Tenn.1993). Unusual collection efforts may include telephone calls or letters. *Ellenberg [v. Tulip Prod. Polymerics, Inc. (In re T.B. Home Sewing Enter., Inc.)]*, 173 B.R. [782, 788 (Bankr.N.D.Ga.1993)].

*Schwinn Bicycle*, 205 B.R. at 572.

For the following reasons, the Court concludes that Blue Bell has not carried its burden of proof regarding its asserted ordinary course of business defense.

### i. Payment frequency

As shown by the trial testimony of Joel Rogers, the Debtor's retention of A&M in August 2008 represented a departure from Bruno's ordinary course of business with its vendors, which included Blue Bell. Rogers testified that Bruno's was running out of cash and hired A&M to help manage its liquidity problems. A&M and Rogers were specifically tasked with managing cash, which led to "stretching," or delaying, payments to vendors. Furthermore, Rogers testified that the procedures instituted by A&M resulted in changing from the issuance of two checks per week to one check per week to Blue Bell, and that once cut, checks were often held by Bruno's prior to being sent to Blue Bell. No evidence was introduced at trial which showed that Bruno's had previously managed its relationship with Bruno's in the fashion recommended and implemented by

11

A&M. Accordingly, this represented a departure from the normal relationship, and thus a departure from the ordinary course of business, between Bruno's and Blue Bell.

### ii. Increased aging of invoices paid during the Preference Period

In *AFA Investment Inc., et al., v. Dale T. Smith & Sons Meat Packing Company (In re AFA Investment Inc., et al.)*, 2016 WL 908212 (Bankr. D. Del. Mar. 9, 2016), Judge Mary Walrath recently ruled that a preference defendant could not avail itself of the ordinary course of business defense where the timing of the invoices changed between the preference period and the pre-preference period. In *AFA Investment*, prior to the preference period, 97% of all invoices were paid within 16-30 days of the invoice date. *AFA Inv.*, 2016 WL 908212 at *4. Out of the subject payments made within the preference period, 96% were paid "after 30 days." *Id*. "The weighted average of the invoice-to-payment period nearly doubled from 22.43 days during the parties' historical relationship to 43.95 days during the preference period." *Id*.

Similarly, in the instant case, during the pre-Preference Period, the Plaintiff's data contained in the Expert Report shows that 92% of invoices were paid at 44 days or sooner. During the Preference Period, by contrast, only 29% of invoices were paid at 44 days or sooner. Further, the average days a check was outstanding increased from 7 days to 16 days, between the pre-Preference Period (excluding the period after A&M was retained) and the Preference Period. As demonstrated by these figures, the timing of the Transfers was outside the range established during the pre-Preference Period. The Court finds that the deviation between the Preference Period and the pre-Preference Period is significant and demonstrates that the Preference Period payments were not in keeping with the normal, ordinary and customary commercial relations between Blue Bell and Bruno's.

### iii. Blue Bell's collection activity

12

Case 11-00063-TOM    Doc 120    Filed 12/20/16    Entered 12/20/16 11:50:34    Desc Main
Document      Page 12 of 18

Blue Bell's collection activity during the Preference Period was unprecedented during the parties' relationship. Blue Bell presented no evidence to demonstrate that it had taken collection techniques rising to the level of those that Blue Bell employed during the Preference Period. During the Preference Period (and slightly before), various Blue Bell employees began contacting Bruno's employees regarding the status of payments. Additionally, Mr. Rogas's acts, on behalf of Blue Bell, of going in person and picking up the final three checks at Bruno's headquarters, rather than receiving them in the JPMorganChase lockbox was unprecedented in the parties' relationship.

For each of the foregoing reasons, the ordinary course of business defense does not shield any of the Transfers. Because Blue Bell's ordinary course of business defense fails, the Court now considers Blue Bell's asserted subsequent new value defense under 11 U.S.C. § 547(c)(4).

### c. Subsequent New Value Defense

The Defendant claims a subsequent new value defense under section 547(c)(4) of the Bankruptcy Code. That section provides that:

> (c) The trustee may not avoid under this section a transfer--
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
> (A) not secured by an otherwise unavoidable security interest; and
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor[.]

The Plaintiff and the Defendant disagree over how this defense should be applied. The Plaintiff requests that the Court adopt the application pronounced by the Eleventh Circuit Court of Appeals in the case *Charisma Investment Co., N.V. v. Airport Systems, Inc. (In re Jet Florida System, Inc.)*, 841 F.2d 1082 (11th Cir. 1988). In that decision, the Eleventh Circuit held that:

> This section has generally been read to require: (1) that the creditor must have extended the new value after receiving the challenged payments, (2) that the new value must have been unsecured, and (3) that *the new value must remain unpaid*.

Case 11-00063-TOM    Doc 120    Filed 12/20/16    Entered 12/20/16 11:50:34    Desc Main
Document    Page 13 of 18

*Id*. at 1083 (emphasis added). The court went on to find:

> In applying [the section 547(a)(2)] definition of new value to the subsequent advance exception, courts have consistently looked to the principal policy objectives underlying the preference provisions of the Bankruptcy Code. The first objective is to encourage creditors to continue extending credit to financially troubled entities while discouraging a panic-stricken race to the courthouse. Another related objective of this section is to promote equality of treatment among creditors. The subsequent advance exception promotes these general policy objectives "because its utility is limited to the extent to which the estate was enhanced by the creditor's subsequent advances during the preference period." 4 Collier on Bankruptcy, ¶ 547.12, at 547-49 n. 5 (15th ed. 1987)[.] Thus, courts have generally required a transfer which fits within the subsequent advance exception to provide the debtor with a material benefit. This focus upon whether a material benefit has been conferred has been explained in terms of insulating a preferential transfer to a particular creditor to the extent that that creditor thereafter replenishes the estate. In such a situation, the creditor pool would not be harmed to the extent of the offset and the fundamental goal of equality of distribution would be preserved.

*Id*. at 1083-84 (some internal citations omitted). In *Jet Florida*, the creditor, a landlord, contended that the debtor's ability to use property that it had leased from the creditor should be considered new value that would prevent the trustee from recovering over $11,000 that the creditor had received during the preference period. *Id*. at 1082-83. The Eleventh Circuit affirmed the district court, which in turn had affirmed the bankruptcy court's conclusion that the landlord had not extended new value. *Id*. at 1084. The court opined that if the debtor had made use of the leased property the creditor's forbearance may have qualified as new value; however, as the district court had remarked, the lease had not replenished the estate but instead was "a financial drain." *Id*. In concluding that the creditor had not provided new value, the Eleventh Circuit did not need to closely examine the second and third elements of the three part test - the new value had been unsecured and had remained unpaid - because those elements "had concededly been satisfied." Id. at 1083.

Several other courts in the Eleventh Circuit have recited the three-part test without the

14

occasion to analyze the "remains unpaid" prong as it was not an issue in those cases. *See Alfa Fire Ins. Co. v Memory (In re Martin)*, 184 B.R. 985, 995 (M.D. Ala. 1995) (Albritton, J.) (citing *Jet Florida*), aff'd 101 F.3d 708 (11th Cir. 1996); *Bender Shipbuilding & Repair Co., Inc. v. Oil Recovery Co. Inc. of Alabama (In re Bender Shipbuilding and Repair Co., Inc.)*, 479 B.R. 899, 903 (Bankr. S. D. Ala. 2012) (Mahoney, J.) (citing *Jet Florida*); *Crews v. Nat'l Coating, Inc. (In re Nat'l Aerospace, Inc.)*, 219 B.R. 625, 629 (Bankr. M.D. Fla. 1998) (Proctor, J.) (citing *Jet Florida*); *Jones v. Ryder Integrated Logistics, Inc. (In re Jotan, Inc.)*, 264 B.R. 735, 754–55 (Bankr. M.D. Fla. 2001) (Funk, J.); *Moltech Power Sys.*, 326 B.R. at 183–84 (citing *Jet Florida*); *JSL Chem. Corp.*, 424 B.R. at 583; *Kelley v. McCormack (In re Mitchell)*, 548 B.R. 862, 895-96 (Bankr. M.D. Ga. 2016).

In other cases, the "remains unpaid" prong was a contested issue. Some courts cited to *Jet Florida* as controlling law that new value must remain unpaid, agreeing that such a requirement furthered the policy objectives behind section 547(c)(4). *See Braniff, Inc. v. Sundstrand Data Control, Inc. (In re Braniff, Inc.)*, 154 B.R. 773, 783–85 (Bankr. M.D. Fla. 1993) (Corcoran, J.); *Welt v. Samsung Semiconductor, Inc. (In re All American Semiconductor, Inc.)*, AP No. 09-01443, 2012 WL 3229295, at *4-5 (Bankr. S.D. Fla. Aug. 6, 2012); *Johnson v. Smith Bros. Oil Co., Inc. (In re Empire Pipe and Dev., Inc.)*, 152 B.R. 1012, 1015 (Bankr. M.D. Fla. 1993) (Paskay, J.); *Drake v. Peeples (In re Topgallant Lines, Inc.)*, BK No. 89-41996, AP No. 91-4141, 1996 WL 33366600, at *11 (Bankr. S.D. Ga. Feb. 29, 1996) (Davis, J.) (finding that the court was bound by *Jet Florida* but not addressing policy considerations).

However, one court within this district held that new value did not have to remain unpaid to be utilized under section 547(c)(4). *HB Logistics, LLC v. Pilot Travel Centers, LLC (In re HB*

15

*Logistics, LLC)*, BK No. 11-82362-JAC-11, AP No. 12-80124, 2013 WL 6542866 (Bankr. N.D. Ala. Dec. 13, 2013) (Caddell, J.) (ret.). According to Judge Caddell:

> Although the Eleventh Circuit has been cited as having adopted the remains unpaid approach, a Georgia bankruptcy court [*TI Acquisition, LLC v. Southern Polymer, Inc. (In re TI Acquisitions, LLC)*, 429 B.R. 377, 383 (Bankr. N.D. Ga. 2010)] recently called into doubt whether the Eleventh Circuit has officially adopted the approach. Instead, the court explained that the language used by the Eleventh Circuit in *Jet Florida System, Inc.* is "best viewed as shorthand for the text of § 547(c)(4)." Other courts and commentators have explained that the Eleventh Circuit's reference to "remains unpaid" was stated in dicta as the only issue before the court was whether a landlord had provided new value to the debtor by continuing to make a leased premises available to the debtor after the debtor's default.

*HB Logistics*, 2013 WL 6542866 at *2. Judge Caddell observed that *Jet Florida* "involved a single transfer and the case is, therefore, not clearly on point with the facts of the case before the Court which involves numerous transfers on a 'running account' basis between the parties." *Id*. Judge Caddell noted that under the Bankruptcy Act of 1898, the section dealing with preferential transfers "limited the amount of the new value setoff to 'such new credit remaining unpaid.'" *Id*. (citing Travis Powers, *Inadequate Shorthand: The Circuit Courts are Split as to Whether There Is a "Remains Unpaid" Requirement in the New Value Exception to Preference Liability*, 22 J. Bankr. L. & Prac. 4 Art. 5 (2013)). He further noted that under the Bankruptcy Code "§ 547(c)(4) only deprives a creditor of the new value exception 'to the extent that (1) new value is secured by an otherwise unavoidable security interest; or (2) after new value is advanced, the debtor makes a transfer to the creditor that is otherwise unavoidable.'" *Id*. In determining that the creditor "is entitled to assert the subsequent new value defense under § 547(c)(4) to the extent the new value has not been paid by an otherwise unavoidable transfer," he concluded:

> To allow the debtor to both avoid the preference and recover the payment for the new value provided by [the creditor] from which the debtor materially benefitted while denying [the creditor] the new value defense would not further the principal policy objections underlying the preference provisions of the Bankruptcy Code: (1) "to encourage creditors to continue extending credit to financially troubled entities

while discouraging a panic-stricken race to the courthouse," and (2) "to promote equality of treatment among creditors."

*Id*. at *3. *See also Wahoski v. American & Efrid, Inc. (In re Pillowtex Corp.)*, 416 B.R. 123, 129-30 (Bankr. D. Del. 2009) ("[T]he trustee should not be able to assert the new value was paid if the trustee is asserting that the paying transaction was in fact a preference which the trustee can avoid. By doing so, the trustee will be able to eliminate the effect of the payment for the new value when he recaptures the preferential transfer.") (quoting *Boyd v. The Water Doctor (In re Check Reporting Services, Inc.)*, 140 B.R. 425, 433 (Bankr. W.D. Mich. 1992)).

While Judge Caddell's reasoning (and that of other courts that have concluded new value does not have to remain unpaid) may be persuasive to some courts, this Court is not inclined to follow *HB Logistics* without clear direction from the Eleventh Circuit Court of Appeals. As in *HB Logistics*, the facts in this case may differ from those in *Jet Florida* because multiple transactions between the parties took place within the preference period; thus, it could be argued that *Jet Florida* is not directly on point in the case before this Court. It is also possible that if the Eleventh Circuit in *Jet Florida* had the occasion to evaluate the "remains unpaid" prong it would have concluded that new value had to be unpaid, or perhaps the court would have determined otherwise. Nonetheless, the Eleventh Circuit did identify a three-part test for determining when the new value defense is applicable and this Court will strictly apply that test to the facts of this case. Blue Bell is entitled to the new value defense only to the extent that the new value it extended remains unpaid.

As noted above, the Trustee presented evidence that if this Court were to determine that new value must remain unpaid, Blue Bell would have exposure of $438,496.47. As also noted above, the calculations presented by Blue Bell differ from those of the Trustee. The Court determines that the exhibits prepared by Bruno's expert witness, Mr. Atkinson, regarding Blue

17

Bell's preference liability after the application of the new value defense are more detailed, thorough, and reliable than those prepared by Mr. Rogas, Blue Bell's branch manager. Therefore, the Court concludes that the Bruno's is entitled to recover $438,496.47 from Blue Bell as preferential transfers and a judgment to that effect is due to be entered. Further, the claim filed by Blue Bell in Bruno's bankruptcy case is due to be disallowed until the judgment is satisfied; however, Blue Bell shall be granted leave to file an amended claim within 60 days of the date of the satisfaction of the judgment. A separate judgment consistent with this Memorandum Opinion will be entered. Therefore, it is

**ORDERED, ADJUDGED, and DECREED** that the Transfers are avoidable in the amount of $438,496.47 under § 547(b) of the Bankruptcy Code. It is further

**ORDERED, ADJUDGED, and DECREED** that pursuant to section 550 of the Bankruptcy Code, $438,496.47 of the Transfers are recoverable against Blue Bell and a judgment in favor of Bruno's and against Blue Bell shall be entered. It is further

**ORDERED, ADJUDGED, and DECREED** that the claim filed by Blue Bell in Bruno's bankruptcy case is due to be disallowed until the judgment is satisfied. Blue Bell shall have leave to file an amended claim within 60 days of the date of the satisfaction of the judgment

Dated: December 20, 2016 /s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge


xc: John D. Elrod, Counsel for the Trustee
Bill D. Bensinger, Counsel for Blue Bell